IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| REBECCA L. HARDY, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN COLVIN, Acting Commissioner ) <br> of Social Security Administration, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 13-752-GMS |

## MEMORANDUM

### I. INTRODUCTION

The plaintiff Rebecca L. Hardy ("Hardy") filed for disability insurance benefits ("DIB") on September 1, 2011, pursuant to Title II of the Social Security Act. This action against defendant Commissioner of Social Security Administration ("SSA") Carolyn Colvin ("Commissioner") arises from the denial of Hardy's application. The SSA denied Hardy's claim initially and on reconsideration. (D.I. 6 at 20.) Hardy thereafter requested an administrative law judge ("ALJ") hearing. (*Id.*) ALJ Melvin Benitz conducted the hearing on August 25, 2011. (*Id.*)

ALJ Benitz issued a written opinion on October 4, 2011, denying Hardy's DIB claim. (*Id.* at 20–30.) The Appeals Council denied review of the ALJ's decision on March 15, 2013. (*Id.* at 1–6.) Hardy filed a timely appeal with the court on April 30, 2013. (D.I. 1.) Presently before the court are the parties' cross-motions for summary judgment. (D.I. 11, 15.) For the reasons that follow, the court will: (1) deny Hardy's motion for summary judgment; and (2) grant the Commissioner's motion for summary judgment.

## II. BACKGROUND

Hardy was born on May 17, 1954. (D.I. 6 at 43.) She has a college education. (*Id.* at 44.) At the time of her alleged disability onset date (April 16, 2009), Hardy was fifty-four years old. She was fifty-five years old, however, at the time of her actual application for DIB. She was fifty-seven years old at the time of the ALJ hearing.

Prior to the alleged onset of her disability, Hardy worked twenty-three years for the University of Delaware as an assistant to the director of budget and finance. (*Id.* at 44–45.) Among her job responsibilities, Hardy administrated the finances, oversaw budget development, worked extensively on grant proposals, and ensured compliance with federal and state regulatory agencies. (*Id.*)

Hardy left her job in April 2009 because of chronic pulmonary bacterial infections. (*Id.* at 45–47.) Her history with such infections date back to 1998. (*Id.* at 321.) Since 2008, Drs. Clifton Hunt (pulmonology) and David Cohen (infectious diseases) have treated Hardy's infections. (*Id.* at 362–92.) On March 4, 2009, Hardy received surgery to treat acid reflux (gastroesophageal reflux disease), which was believed to be a contributor to her infections. (*Id.* at 334, 347–48.) Dr. Jeffrey Zern performed the surgery. (*Id.*)

Around this time, Hardy also began treatment with Dr. Maria Lazar, a primary care physician. (*Id.* at 429.)

### A. Medical Treatment During Relevant Time Period

#### 1. Pulmonary Treatment

On May 1, 2009, Dr. Cohen noted that, despite her periodic episodes of shortness of breath, Hardy had improved since 2008. (*Id.* at 437.) On May 4, 2009, Hardy told Nurse Carol Jaques—

in Dr. Lazar's office—that she could not work; she presented disability papers for Dr. Lazar's completion. (*Id.* at 428.) Nurse Jaques noted that Hardy had coarse ronchi but no wheeze. (*Id.*)

On June 1, 2009, during a follow-up visit with Dr. Zern, Hardy reported "near normal activity level." (*Id.* at 357.) Dr. Zern noted that Hardy was "progressing well postoperatively," without any further reflux symptomology. (*Id.*) On June 30, 2009, Hardy again saw Nurse Jaques who noted that Hardy had considerable anxiety over her illness: "Emotionally, [Hardy] is unable to pull together . . . . [She] feels she is unable to function." (*Id.* at 423.) Again, Hardy had coarse ronchi without wheeze. (*Id.*)

On August 3, 2009, Dr. Hunt examined Hardy. (*Id.* at 499.) Hardy did exhibit increased shortness of breath but no increase in cough or sputum production. (*Id.*) Hardy's chest examination again demonstrated scattered ronchi, but examinations of her heart, abdomen, and extremities were "unremarkable." (*Id.*) During a visit with Nurse Jaques on August 7, 2009, Hardy explained that she was no longer being paid while on disability. (*Id.* at 425.) Problems with her finances and her family caused Hardy additional anxiety: "[Hardy] is just completely stressed." (*Id.*) On August, 26, 2009, however, Hardy reported that she was feeling better, with reduced anxiety, and that her medication seemed to be working. (*Id.* at 426.) Her breathing was clear to auscultation, with no ronchi. (*Id.*)

Dr. Cohen treated Hardy again in September 2009. (*Id.* at 362–63.) He noted that she was doing "extremely well," after approximately sixteen months of treatment. (*Id.* at 362.) Dr. Cohen recommended continuing with her existing treatment. (*Id.*) Although Hardy reported that she felt poorly, Dr. Cohen found that her activity level indicated that she was "breathing reasonably well." (*Id.* at 363.)

3

On September 25, 2009, Hardy went to the emergency room for shortness of breath. (*Id.* at 401.) The treating physicians were unable to find a specific cause; an x-ray showed improvement from her previous exam on March 5, 2009. (*Id.* at 396, 398.) Hardy was discharged shortly thereafter. (*Id.* at 405.) Overall, to the attending physician, Hardy was "quite well-appearing." (*Id.* at 407.)

Hardy received a CT scan in October 2009, which showed "no significant interval change," as compared to her previous scan from April 2009. (*Id.* at 490–92.) In February 2010, Hardy sought treatment from Dr. Hunt for worsening symptoms, including increased cough and fever. (*Id.* at 500.) Hardy, however, reported no changes to her daily activities, her eating habits, or her sleep patterns. (*Id.*) After examination, Dr. Hunt noted that Hardy's respiration appeared normal. (*Id.* at 502.) Dr. Hunt also evaluated Hardy in March and May 2009, and made similar findings. (*Id.* at 507–09, 513–15.) When Dr. Cohen evaluated Hardy in April 2009, he noted that her lungs were clear, despite her complaints of increased cough. (*Id.* at 436.)

A CT scan in June 2010 again showed Hardy's lung condition to be stable, with no notable changes from her previous exams. (*Id.* at 506–07.) Dr. Cohen and Dr. Hunt made similar findings during their subsequent evaluations. (*Id.* at 477–79, 529.) Dr. Cohen prescribed an aggressive antibiotic regimen on August 4, 2010. (*Id.* at 528.) Hardy reported improvement in her breathing in follow-up visits in September and October 2010. (*Id.* at 570–71.)

On January 11, 2011, another CT scan again confirmed that Hardy's lung physiology was stable. (*Id.* at 548.) Dr. Hunt's evaluation on February 7, 2011, also remained consistent with his prior notes. (*Id.* at 550–52.) Hardy sought a second opinion from Dr. Alexander Swift on March 1, 2011. (*Id.* at 558–60.) Dr. Swift described Hardy's care to that point as "excellent" and agreed with the present plan of care. (*Id.* at 560.) Hardy subsequently restarted antibiotic treatment and,

in June 2011, reported to Dr. Cohen that she was breathing better and that her condition was mild. (*Id.* at 561.)

### 2. Knee Treatment

An x-ray image of Hardy's knee revealed no evidence of fracture or dislocation. (*Id.* at 430.) Nurse Jaques recommended rest and ice. (*Id.* at 426.) She noted normal range of motion in Hardy's limbs. (*Id.* at 427–28.)

Hardy sought treatment from Dr. Andrew Gelman on January 9, 2010. (*Id.* at 410.) He noted that Hardy's knee difficulties were likely the result of an arthroscopic procedure several years earlier. (*Id.*) He diagnosed Hardy with posttraumatic arthritis. (*Id.* at 411.) Hardy responded well to a series of knee injections, from February to March 2010 and again from December 2010 to January 2011. (*Id.* at 537–44.)

### 3. Hearing Tests

A hearing test in December 2008 revealed a decline in Hardy's hearing. (*Id.* at 316.) She, however, maintained normal hearing sensitivity and excellent word recognition abilities in both ears. (*Id.*) Hardy's hearing was tested again in February 2010, revealing no changes from the December 2008 test. (*Id.* at 413.)

### 4. Psychological Examinations

Hardy never sought treatment from a mental health professional. (*Id.* at 70.) Nurse Jaques' notes in 2009 indicated that Hardy was stressed and anxious about her illness and finances. (*Id.* at 423, 425.) Hardy took Xanax. Dr. Hunt and Dr. Cohen did not observe any psychiatric concerns.

## B. Expert Opinions

Dr. Brian Simon performed a consultative psychological exam on May 4, 2010. (*Id.* at 443–50.) He opined that Hardy's "psychiatric problems do not appear to be to the severity that

5

they would limit her ability to make decisions, adapt to different circumstances, as well as exercising judgment, insight, and common sense."

Dr. Carlene Tucker-Okine, a reviewing state agency physician, completed a psychiatric review technique form on May 6, 2010. (*Id.* at 583–93.) She noted that Hardy's psychiatric impairments were not severe and that she would have no more than mild limitations to her daily activities, social functioning, or concentration, persistence, or pace. (*Id.* at 583, 591.)

Dr. Nisha Singh, a reviewing state agency physician, completed a physical residual functional capacity ("RFC") assessment on May 17, 2010. (*Id.* at 451–58.) Dr. Singh opined that Hardy could lift up to twenty pounds occasionally, and up to ten pounds frequently. (*Id.* at 452.) She opined that Hardy could stand or walk for four hours and sit for about six hours in a typical eight-hour workday. (*Id.*) Dr. Singh noted that Hardy could perform her daily activities, such as driving, shopping, personal care, laundry, preparing meals, and walking. (*Id.* at 453.) She opined that Hardy had no limitations in her ability to communicate. (*Id.* at 455.)

Dr. Michael Borek, another state agency physician, reviewed Dr. Singh's opinions on September 5, 2010. (*Id.* at 531.) Dr. Borek affirmed Dr. Singh's opinions, noting that they were consistent with the clinical records and Hardy's own statements. (*Id.*)

Finally, Dr. Lazar completed a medical assessment form on May 15, 2011. (*Id.* at 532–35.) Dr. Lazar opined that Hardy was unable to perform routine, repetitive tasks, or interact with others. (*Id.* at 532.) She opined that Hardy could not walk a single city block without rest or severe pain. (*Id.*) Dr. Lazar also noted that Hardy could only sit up to two hours and stand/walk for only about twenty minutes. (*Id.* at 533.) According to Dr. Lazar, Hardy could rarely lift less than ten pounds. (*Id.* at 534.) Dr. Lazar filled out another functional limitations form on August 9, 2011. (*Id.* 582.) In it, Dr. Lazar noted a number of considerable limitations, opining that Hardy

6

could not interact appropriately with the general public and could not complete a normal workday/week without interruptions and an unreasonable number of rest periods. (*Id.*) Dr. Lazar also opined that Hardy would have noticeable difficulty performing accurately and consistently, accepting instructions and criticism, working with co-workers, and dealing with stress of semiskilled work. (*Id.*)

### C. <u>**The ALJ's Findings**</u>

On October 4, 2011, the ALJ issued an unfavorable decision finding that Hardy was not disabled. (*Id.* at 20–30.) Hardy had last engaged in substantial gainful employment on April 16, 2009, the alleged onset date of disability. (*Id.* at 22.) ALJ Benitz determined that Hardy's lung infections and degenerative disease in her right knee were severe impairments. (*Id.*) Hardy's acid reflux, hearing loss, and mental impairments (*i.e.*, depression and anxiety) were found to be non-severe impairments. (*Id.* at 22–23.)

The ALJ found that Hardy's lung infections and arthritis in her knee, however, were not listing-level severity, according to 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 23–24.) Taking into account Hardy's severe impairments, the ALJ found that she had the RFC to perform light work, with the conditions that she could only lift up to twenty pounds occasionally, ten pounds frequently, and that she could sit and stand for an hour at a time, on an alternating basis. (*Id.* at 24.) ALJ Benitz determined that Hardy could perform semiskilled work.

The ALJ found that Hardy was unable to perform any of her past relevant work; nonetheless, in light of testimony from the Vocational Expert ("VE"), there were still a significant number of jobs in the national economy that Hardy could perform. (*Id.* at 28–29.) Ultimately, the ALJ determined that Hardy was not under a disability as defined in the Social Security Act, at any time from April 16, 2009, to the date of decision. (*Id.* at 29.)

7

## III. STANDARD OF REVIEW

### A. Reviewing the ALJ's Decision

A reviewing court will only reverse the ALJ's decision if the ALJ did not apply the proper legal standards or if the decision was not supported by "substantial evidence" in the record. 42 U.S.C. § 405(g); *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992). "Where the ALJ's findings of fact are supported by substantial evidence," the court is "bound by those findings." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). "[S]ubstantial evidence . . . means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Thus, substantial evidence "may be somewhat less than a preponderance of evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (quoting *Ginsburg v. Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971)). "If there is only a slight preponderance of the evidence on one side or the other, the [ALJ's] finding should be affirmed." *Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

In determining whether substantial evidence supports the ALJ's findings, the court may not undertake a *de novo* review of the arguments, nor may it re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). The inquiry is not whether the reviewing court would have made the same determination, but rather whether the ALJ's conclusion was reasonable. *Richardson*, 402 F.2d at 401; *see Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). ALJ decisions are therefore to be accorded a high level of deference in review. Even if the court would have decided the case differently, it must defer to the ALJ and affirm the Commissioner's decision so long as that decision is supported by substantial evidence. *Monsour*, 806 F.2d at 1190–91.

An agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. *Fargnoli*, 247 F.3d at 44 n.7 ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 63 (1943))). "The district court's function is to determine whether the record, *as a whole*, contains substantial evidence to support the Commissioner's findings." *Cefalu v. Barnhart*, 387 F. Supp. 2d 486, 491 (W.D. Pa. 2005) (citing *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994)). In Social Security cases, this substantial evidence standard applies to motions for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). *See Woody v. Sec'y of the Dep't of Health & Human Servs.*, 859 F.2d 1156, 1159 (3d Cir. 1988).

## B. Applicable Statute & Law

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner has promulgated regulations for determining disability by application of a five-step sequential analysis. *See* 20 C.F.R. § 404.1520. The ALJ, the reviewing Appeals Council, and the Commissioner evaluate each case according to this five-step process until a finding of "disabled" or "not disabled" is obtained. *See* § 404.1520(a). The process is summarized as follows:

1. If the claimant currently is engaged in substantial gainful employment, she will be found "not disabled."
2. If the claimant does not suffer from a "severe impairment," she will be found "not disabled."
3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 *and* has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled." Otherwise, she will be found "not disabled."

9

4. If the claimant can still perform work she has done in the past ("past relevant work") despite the severe impairment, she will be found "not disabled."
5. Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not she is capable of performing other work in the national economy. If she is incapable, a finding of disability will be entered. Conversely, if the claimant can perform other work, she will be found "not disabled."

§ 404.1520(b)–(f); *see also Carey v. Astrue*, No. 10-413-GMS, 2015 WL 1467205, at *6 (D. Del. Mar. 30, 2015) (paraphrasing the five-step process for determining disability).

The disability determination analysis involves a shifting burden of proof. *See Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983). In the first four steps of the analysis, the burden is on the claimant to prove every element of his or her claim by a preponderance of the evidence. At step five, however, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment the claimant is able to perform. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000); *see also Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); *Olsen v. Schweiker*, 703 F.2d 751, 753 (3d Cir. 1983). Substantial gainful employment is defined as "work that—(a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit." 20 C.F.R. § 404.1510. When determining whether substantial gainful employment is available, the ALJ is not limited to consideration of the claimant's prior work, but may also consider any other substantial gainful activity which exists in the national economy. *See* 42 U.S.C. § 423 (d)(1)(A), (2)(A); *Heckler v. Campbell*, 461 U.S. 458, 460 (1983).

## IV. DISCUSSION

Hardy asserts that the ALJ's decision is flawed on several grounds. (D.I. 11 at 16–30.) First, Hardy argues that the ALJ failed to resolve an inconsistency between the VE testimony and

10

the Dictionary of Occupational Titles ("DOT"), concerning the sit/stand option. (*Id.* at 16–18.) Second, Hardy argues that the ALJ failed to properly consider her age as a criterion for the Medical-Vocational Guidelines. (*Id.* at 18–21.) Third, Hardy argues that the ALJ erred in determining that her hearing impairment was non-severe. (*Id.* at 21–22.) Fourth, Hardy argues that the ALJ failed to afford adequate weight to the opinion of her treating physician Dr. Lazar. (*Id.* at 22–28.) Fifth, and finally, Hardy argues that the Commissioner failed to satisfy her burden to prove that there were jobs for Hardy in the national economy. (*Id.* at 28–30.)

### A. **Sit/Stand Option**

In his hypothetical question posed to the VE, the ALJ included the condition that the person "can sit for an hour, stand for an hour consistently on an alternate basis during an eight-hour day." (D.I. 6 at 78.) The parties refer to this opportunity to alternate between standing and sitting as the "sit/stand option."

Hardy argues that the ALJ failed to have the VE address an inconsistency between his testimony and the DOT. The DOT does not address the sit/stand option for any of its occupations. Therefore, Hardy asserts that the VE's proposed jobs conflict with the DOT.

"Social Security Ruling 00-4p requires that the ALJ ask the vocational expert whether any possible conflict exists between the vocational expert's testimony and the DOT, and that, if the testimony does appear to conflict with the DOT, to 'elicit a reasonable explanation for the apparent conflict.'" *Burns v. Barnhart*, 312 F.3d 113, 127 (3d Cir. 2002) (quoting SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)). "The Ruling requires that the explanation be made on the record and that the ALJ explain in his decision how the conflict was resolved." *Id.*

The court disagrees with Hardy's view that the VE's testimony was inconsistent with the DOT. The DOT's silence on the sit/stand option does not place it in tension with the VE's

11

suggested occupations. *See Conn v. Astrue*, 852 F. Supp. 2d 517, 528 (D. Del. 2012) ("[T]he VE's testimony and the DOT are not in conflict; the DOT simply does not address sit/stand options."); *Faulkner v. Astrue*, No. 06-202-MPT, 2007 WL 2936111, at *14 (D. Del. Oct. 9, 2007) ("Contrary to plaintiff's argument, the testimony of . . . the vocational expert[] and the information in DOT are not in conflict. DOT does not address whether a job allows an employee to sit or stand. It only covers how much sitting or standing a particular occupation requires."). The ALJ was not obligated to resolve an inconsistency that did not exist.[1]

The VE testified that a hypothetical person with Hardy's RFC could perform three jobs: (1) receptionist, bookkeeper; (2) office manager; and (3) clerical assistant.[2] (D.I. 6 at 79–80.) "SSR 00-4p does not limit a VE's testimony solely to the DOT." *Conn*, 852 F. Supp. 2d at 528. As the DOT is silent on the sit/stand option, the VE was entitled to rely on his own "education, training and experience" to opine about Hardy's ability to maintain a job. *See id.* Hardy has made no challenge to the VE's qualifications. Thus, the ALJ did not err in accepting the VE's opinion that the proffered occupations were consistent with Hardy's RFC.

---

[1] In his decision, ALJ Benitz mistakenly used what appears to be form language from a previous opinion, stating that the VE appropriately relied on his expertise to explain why his opinions differed from the DOT. (D.I. 6 at 29.) In fact, the VE never acknowledged the DOT's silence on the sit/stand option during his testimony. (*Id.* at 79–80.) The court agrees with the Commissioner that this gaffe does not change the outcome—it was harmless error. The ALJ's mistake cannot create an inconsistency between the VE's testimony and the DOT that was not present in the first place.

Hardy's reliance on *Smith v. Astrue* is misplaced. 961 F. Supp. 2d 620 (D. Del. 2013). That case from this District did not hold that the DOT's silence on the sit/stand option automatically created an inconsistency that needed to be addressed. *Id.* at 657–58. Rather, *Smith* merely stated that, in the context of the specific case, the ALJ's question to the VE concerning the sit/stand option was inadequate to address whether the VE's opinions were fully consistent with the DOT. *Id.* at 658 ("The Court is not persuaded that this question was intended to, or had the effect of, more broadly addressing potential inconsistencies between the jobs listed by the VE and the contents of the DOT."). Hardy is incorrect that the court in *Smith* remanded solely to allow the ALJ to analyze the sit/stand option.

[2] The ALJ ultimately only identified the positions of receptionist, bookkeeper and clerical assistant—the VE's proposed "sedentary" positions—in his decision.

B. **Medical-Vocational Guidelines**

As of the alleged disability onset date, Hardy was fifty-four years old, within the "person closely approaching advanced age" category. *See* 20 C.F.R. § 404.1563(d) (age fifty to fifty-four). Hardy, however, turned fifty-five years old as of May 17, 2009, placing her in the "person of advanced age" category. *See* § 404.1563(e) (age fifty-five or older). Hardy contends that the ALJ erred by failing to establish the transferability of her prior work experience to the VE's proposed sedentary occupations, as required by Social Security Regulations.

> To find that an individual who is age 55 or over and is limited to sedentary work exertion has skills transferable to sedentary occupations, there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry.... [These] [i]ndividuals ... cannot be expected to make a vocational adjustment to substantial changes in work simply because skilled or semiskilled jobs can be identified which have some degree of skill similarity with their [past relevant work].

SSR 82-41, 1982 WL 31389, at *5 (Jan. 1, 1982); *see also* 20 C.F.R. § 1568(d)(4) ("If you are of advanced age and you have a severe impairment(s) that limits you to no more than *sedentary* work, we will find that you have skills that are transferable to skilled or semiskilled sedentary work only if the sedentary work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.").

The ALJ adopted two of the VE's three proposed jobs in his decision. (D.I. 6 at 29.) Both of these jobs were described as sedentary work. (*Id.* at 29, 79–80.) Although identifying only these two sedentary jobs in the national economy, the ALJ actually determined that Hardy had the RFC to perform a range of *light* work, with some limitations on the amount of weight she could lift and the time she was capable of sitting/standing. (*Id.* at 24.) "[G]rid rules are based on the RFC and not the characteristics of the available jobs . . . ." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 36 n.1 (6th Cir. 2010). Hardy is mistaken in her assertion that the ALJ was required

13

in this instance to adduce evidence from the VE that her past work was "so closely related to other jobs" that she would require only a "minimal amount of job orientation." *See* SSR 82-41, 1982 WL 31389, at *5.

The ALJ assessed Hardy with an RFC that did not fit squarely into any single "grid" category of the Medical-Vocational Guidelines. (D.I. 6 at 24.) In these situations, it is proper for the ALJ to "consult a vocational resource," such as the VE. SSR 83-12, 1983 WL 31253, at *1–2 (Jan. 1, 1983). The VE testified that Hardy possessed skills that could be transferred to the hypothetical jobs. (D.I. 6 at 79–80.) The ALJ also acknowledged that Hardy transitioned from "closely approaching advanced age" to "advanced age" when she turned fifty-five years old. (*Id.* at 28.) The court sees no error with the ALJ's treatment of Hardy's age or the Medical-Vocational Guidelines.

## C. Hearing Impairment

Hardy asserts that the ALJ's finding that her hearing loss was only a non-severe impairment was not supported by substantial evidence. Hardy argues that her hearing loss is "more than a slight abnormality and causes more than a minimal effect on her ability to work," thus satisfying the relatively low standard for finding an impairment to be "severe." (D.I. 12 at 21–22); *see McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) ("[A]n applicant need only demonstrate something beyond a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work. Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. In short, the step-two inquiry is a *de minimis* screening device to dispose of groundless claims." (internal citations, quotation marks, and alterations omitted)).

14

Despite her conclusory statement quoted above, Hardy produced no evidence that her hearing loss had *any* effect on her ability to work. Indeed, the ALJ noted as much, saying that Hardy's hearing loss "do[es] not cause any functional restrictions." (D.I. 6 at 22.) Hardy did produce the results of her hearing tests, but these fail to indicate that her ability to work would be hindered. (*Id.* at 316, 413.) Hardy's own testimony at the hearing—though it describes her symptomology—also does not aver that her functioning would be limited. (*Id.* at 53–54.) Dr. Singh, one of the reviewing physicians, opined that Hardy had no communicative limitations, which included hearing and speaking. (*Id.* at 455.) Thus, the court finds that the ALJ's determination that Hardy's hearing loss was only a non-severe impairment was supported by substantial evidence.

### D. Treating Physician Opinion

Dr. Lazar completed two medical assessment forms opining that Hardy was incapable of performing full-time work. (D.I. 6 at 532–35; 582.) ALJ Benitz rejected these opinions. Hardy contends that the ALJ failed to afford Dr. Lazar's opinions adequate weight, as she was Hardy's treating physician.

Generally, the ALJ must give more weight to opinions from treating sources but is only required to give controlling weight if he finds that "the treating source's opinion on the issue(s) of the nature and severity of [claimaint's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 1527(c)(2); *see also Brown v. Astrue*, 624 F.3d 193, 196 (3d Cir. 2011) (noting that a treating physician's opinion may be outweighed by other evidence). Where an ALJ does not afford controlling weight to the opinion of a treating source, he should take into account a number of factors in determining precisely the amount of weight to

15

give each medical opinion, such as: (1) examining relationship, (2) treatment relationship (including the time and nature of treatment), (3) supportability of the opinion, (4) consistency of the opinion, (5) specialization, and (6) any other factors brought to the ALJ's attention. § 1527(c).

After summarizing Hardy's medical history, ALJ Benitz explained the weight he assigned to each expert opinion. (D.I. 6 at 27–28.) The ALJ assigned "significant weight" to Dr. Singh's opinion and Dr. Borek's opinion affirming that of Dr. Singh. (*Id.* at 27.) The ALJ noted that Dr. Singh's and Dr. Borek's RFC assessments were consistent with the medical records as a whole and aligned with the ALJ's own view of Hardy's RFC. (*Id.*) The ALJ also gave significant weight to Dr. Tucker-Okine, who opined that Hardy's mental impairments were not severe. (*Id.* at 27.) Finally, the ALJ gave Dr. Simon significant weight as well, who opined that Hardy's daily activities were only moderately restricted, for similar reasons. (*Id.* at 27–28.)

ALJ Benitz did not, however, afford Dr. Lazar's opinion considerable weight and instead rejected her opinions. (*Id.* at 28.) The ALJ reasoned that, despite her being a treating source, Dr. Lazar's opinions were undermined by the medical record as a whole. (*Id.*) The ALJ also determined that Dr. Lazar's opinions were conclusory, unsubstantiated, and beyond her scope of expertise, and that they merely recited Hardy's own subjective complaints. (*Id.*)

The court finds substantial evidence in support of the ALJ's conclusions. First, Dr. Lazar's opinions in her assessments took the form of checkboxes or circles. (*Id.* at 532–35, 582.) She did not provide any reasoning or cite to any previous treatment records in support of these conclusions. The ALJ properly assigned reduced weight to her Dr. Lazar's opinion, as "supportability" is a factor for the ALJ's consideration. *See* 20 C.F.R. § 1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides

16

for an opinion, the more weight we will give that opinion."); *see also Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").

Moreover, the opinions in Dr. Lazar's assessments are not supported by previous medical notes, neither from Drs. Hunt and Cohen, nor Dr. Lazar herself. While the treatment records periodically illustrated that Hardy's lung infections interfered with her ability to breathe, overall they fail to support the dramatic limitations identified in Dr. Lazar's 2011 assessments, which had never previously been identified, dating back over two years. Dr. Cohen noted in September 2009 that Hardy was breathing reasonably well, considering the fact that she had walked around Washington, D.C. with her grandkids. (D.I. 6 at 363.) Hardy would exercise with yoga, and her gait was consistently normal. The CT and x-ray images showed Hardy's lung physiology to be stable, and her physicians' treatment notes do not indicate any dramatic changes throughout the length of the alleged disability period. Thus, the inconsistencies in Dr. Lazar's ultimate RFC assessment further justifies the ALJ's decision to discount her opinions. *See* 20 C.F.R. § 1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

In addition, Dr. Lazar, despite being Hardy's primary care physician, was not a specialist in the relevant fields of pulmonology, infectious diseases, orthopedics, or psychology. Her specialty was family medicine. *See* § 1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). The court finds substantial evidence in support of the ALJ's decision to afford greater weight to the opinions of the non-examining consulting physicians over those of Dr. Lazar, Hardy's treating physician. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356,

17

361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations. Although treating and examining physician opinions often deserve more weight than the opinions of doctors who review records, the law is clear that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity. State agent opinions merit significant consideration as well." (internal citations, quotation marks, and alterations omitted)); *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011) ("Although there was record evidence from a treating psychiatrist suggesting a contrary conclusion, the ALJ is entitled to weigh all evidence in making its finding." (footnote omitted)).

### E. **Jobs in the National Economy**

Finally, Hardy argues that the ALJ's acceptance of the VE's testimony that there were jobs in the national economy that she could perform was not supported by substantial evidence. As stated above, the Commissioner bears the burden of establishing that a claimant's RFC permits her to perform jobs in the national economy. *See Sykes*, 228 F.3d at 263. The VE in this case testified that a hypothetical person with Hardy's RFC could perform three jobs that were available in the national and local economies: (1) receptionist, bookkeeper; (2) office manager; and (3) clerical assistant. (D.I. 6 at 79–80.) In his decision, the ALJ ruled that Hardy could perform two of these positions—receptionist, bookkeeper and clerical assistant. (*Id.* at 29.)

First, Hardy argues that, because the ALJ improperly discounted Dr. Lazar's opinion, the hypothetical question addressed by the VE did not accurately convey Hardy's RFC. For the reasons already discussed, the ALJ decision to reject Dr. Lazar's opinion was supported by substantial evidence.

Second, Hardy argues that the ALJ could not rely on the VE's testimony because of unreconciled inconsistencies between the testimony and the DOT. For the reasons already

18

discussed, the DOT's silence concerning a sit/stand option did not create an inconsistency with the VE's testimony that required an explanation.

Third, Hardy argues that the VE's testimony did not include an opinion as to whether she would require vocational adjustment, a requirement given her "advanced age" status. For the reasons already discussed, the ALJ did not err because he assessed Hardy with an RFC to perform light work (not merely sedentary work) and properly followed the Medical-Vocational Guidelines.

Fourth, Hardy argues that the ALJ's hypothetical question did not include Hardy's hearing loss as a limitation on functionality. For the reasons already discussed, the ALJ's decision to classify Hardy's hearing loss as a non-severe impairment—*i.e.*, "it does not significantly limit [her] physical or mental ability to do basic work activities"—was supported by substantial evidence. *See* 20 C.F.R. § 404.1521(a). Therefore, the ALJ did not err by excluding a hearing limitation from the hypothetical question. *See Rutherford*, 399 F.3d at 554 ("We do not require an ALJ to submit to the vocational expert every impairment *alleged* by a claimant. Instead the directive . . . is that the hypotheticals posed must 'accurately portray' the claimant's impairments and that the expert must be given an opportunity to evaluate those impairments 'as contained in the record.'").

Finally, Hardy contends that medical evidence in the record conflicts with the VE's testimony that she was capable of performing semi-skilled work. Hardy, however, only cites Dr. Lazar's assessment forms, which—as already discussed—the ALJ rejected. The ALJ's decision to do so was supported by substantial evidence. In formulating his hypothetical question, the ALJ is not obligated to include alleged impairments that he finds are not supported or incredible. *See id.*; *see also Chandler*, 667 F.3d at 361 ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). The Commissioner sustained her step-five burden.

## V. CONCLUSION

For the foregoing reasons, the court grants the Commissioner's motion for summary judgment (D.I. 15) and denies Hardy's motion for summary judgment. (D.I. 11.)

Dated: August 21, 2015

_____
UNITED STATES DISTRICT JUDGE